**O & G CARRIERS, INC.,**
**et al., Plaintiffs,**

**v.**

**Howard A. SMITH, et al., Defendants.**

**No. 89 Civ. 3131(TPG).**

United States District Court,
S.D. New York.

Aug. 20, 1992.

**1530**

Irvin Rothfarb, New York City, for plaintiff Rothfarb.

Elliot Silverman, Gold & Wachtel, New York City, for plaintiffs O & G, et al.

Ronald S. Herzog, Jackson & Nash, New York City, for defendants Smith, Smith Energy, Smith Energy Pension.

John H. Eickemeyer, Solinger Grosz & Goldwasser, P.C., New York City, for defendants Robert Bereson, Bereson.

Barry G. Saretsky, Bower & Gardner, New York City, for defendants Joel Berson, Moore, etc.

David T. Eames, Bodian & Eames, New York City, for defendants Luck, Luck Petroleum.

Joseph Aronauer, Morgenthau, Greenes & Goldfarb, P.C., New York City, for defendants Hamby Consultant, W.R. Hamby.

## OPINION

GRIESA, District Judge.

This action arises out of plaintiffs' purchases of interests in several oil and gas drilling ventures. Plaintiffs allege causes of action under the federal securities laws, the Racketeer Influenced and Corrupt Or-

ganizations Act (RICO), and several state law theories. Plaintiffs claim, *inter alia,* that defendants made material misrepresentations and omissions in the offering memoranda for the ventures in order to induce plaintiffs to invest; sent misleading income statements which falsely made it appear that one of the ventures was profitable, in order to induce plaintiffs to invest in successive ventures; and mismanaged the ventures. Plaintiffs seek to recover their investments.

Diversity of citizenship is not present. Plaintiffs' federal claims are the sole basis for federal jurisdiction.

The court dismissed plaintiffs' initial complaint but granted plaintiffs leave to replead. Plaintiffs have filed an amended complaint.

There are several motions to dismiss the amended complaint. All of the defendants move to dismiss the securities fraud and RICO claims pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6). They also move to dismiss the securities fraud claims on statute of limitations grounds and to dismiss the pendent state law claims for lack of jurisdiction. The Luck defendants and the Hamby defendants also move to dismiss some of the state claims as against them for failure to state a claim.

Defendants have requested that sanctions be imposed against plaintiffs under Fed.R.Civ.P. 11. Plaintiffs have requested sanctions against defendants for making the motion to dismiss.

The securities fraud and RICO claims are dismissed. All state claims are also dismissed. The applications for sanctions are denied.

## BACKGROUND

### A. PARTIES

This action concerns investments in limited partnerships in oil and gas ventures in Ohio and Texas. Since 1981 there have been 13 such ventures. Twelve of the ventures were in Ohio and one was in Texas. The twelve Ohio ventures were designated successively with letters A through L. Only four of the. Ohio ventures and the Texas venture are at issue here. The four Ohio ventures are referred to in the amended complaint as the 1983–G partnership, the 1984–J partnership, the 1985–K partnership and the 1985–L partnership. The Texas venture is referred to as the 1986–A partnership. All the partnerships at issue were organized under New York law.

There are five plaintiffs. Three of them acquired interests in Ohio partnerships. Plaintiff Jack Lindner allegedly invested $50,000 in the 1983–G partnership. Plaintiff Anneliese Lindner, his wife, invested $100,000 in the 1984–J partnership and $50,000 in the 1985–K partnership, and it is alleged that she "received" Jack Lindner's interest in the 1983–G partnership. Robyn Lindner, the Lindners' daughter but not a plaintiff, invested $25,000 in the 1985–L partnership and "assigned" her interest to plaintiff O & G Carriers, Inc., of which Jack Lindner is president.

Plaintiff O & G Carriers allegedly purchased a "minority working interest" in the Texas oil wells for $537,500. Plaintiffs Shirley Bren and Irvin Rothfarb each invested $37,500 in the 1986–A partnership.

Defendants Howard Smith and Smith Energy Co. are general partners of all the partnerships at issue. It is alleged that they fraudulently induced plaintiffs to invest in the partnerships. These two defendants, along with defendant Smith Energy Co. Pension Plan, will be referred to as the Smith defendants. It is not alleged that the Pension Plan had any role in getting plaintiffs to invest. Instead, the amended complaint alleges only that the Pension Plan was funded "in whole or in part from funds obtained from the oil and gas ventures."

Defendant Berenson, Berenson, Adler & Co. is an accounting firm, and defendant Robert Berenson, a certified public accountant, is a member of that firm. These defendants will be referred to as the Berenson defendants. The Berenson defendants were the accountants for the ventures. They were allegedly responsible for the collection and disbursement of funds in relation to the ventures. The Berenson defendants allegedly "supplied historical fi-

nancial data" for the offering memoranda, prepared interim income statements for the partnerships and recommended to some of the plaintiffs—which plaintiffs are not specified—that they invest in the partnerships.

Defendant Moore, Berson, Lifflander, Eisenberg & Mewhinney is a law firm, and defendant Berson is a member of the firm. These defendants will be referred to as the Berson defendants. The Berson defendants allegedly prepared and mailed the offering memoranda. It is also alleged that the Berson defendants "enabled" Smith to make improper expenditures with funds belonging to the partnerships and then concealed Smith's wrongdoing from plaintiffs.

Defendants Luck Petroleum Corp. and John Luck, Jr., the owner and president of Luck Petroleum, will be referred to as the Luck defendants. They were involved only with the Texas venture. Luck allegedly sold working interests in the Texas oil wells to the 1986–A partnership and to O & G Carriers. It is alleged that the Luck defendants obtained a misleading report evaluating the Texas property (the Hamby report), which was included in the offering memorandum for the 1986–A partnership. They also allegedly made improper expenditures in regard to the operation of the Texas wells.

Defendant Hamby Consultant, Inc. is an engineering firm, and defendant W.R. Hamby is a petroleum engineer. These defendants will be referred to as the Hamby defendants. They prepared the Hamby report, which allegedly contained false and misleading statements. There is no allegation that the Hamby defendants made any representations directly to any of the plaintiffs. Instead, it is alleged that the Hamby defendants prepared the report and knew that it would be used in an offering memorandum.

## B. THE ALLEGATIONS OF THE AMENDED COMPLAINT

In regard to the Ohio partnerships, it is alleged that the offering memoranda for those partnerships each contained several false or misleading statements that induced plaintiffs to invest. It is alleged, for example, that the offering memorandum for the 1983–G partnership stated that investors in a prior Smith partnership received a 56.8% return on their investments; that prior Smith partnerships had drilled 10 to 16 wells; that prospective subscribers were required to pay in advance of the closing and a minimum amount of funds had to be raised for the offering to close; and that Smith would purchase a unit in the partnership and would receive a management fee equal to 6% of the aggregate amount contributed to partnership capital. It is alleged that in various ways these statements were false or misleading.

The allegations regarding the other Ohio offering memoranda are substantially similar to those regarding the 1983–G partnership. The dates when the offering memoranda were disseminated and when the various plaintiffs invested, however, are not provided.

Additionally, it is alleged that in the period before Anneliese Lindner invested in the 1984–J and 1985–K partnerships, the Berenson and Smith defendants mailed false income statements regarding the 1983–G partnership to Jack Lindner. These statements allegedly failed to disclose the deferral of expenses for the oil wells in the 1983–G partnership and thus made the 1983–G partnership appear profitable when it was not. It is alleged that these statements were made to induce investors to invest in subsequent Smith partnerships and that Anneliese Lindner relied on the representations made to her husband in the statements.

There are also allegations that the Smith defendants sold the oil wells belonging to the 1983–G partnership and unspecified assets of the 1984–J partnership to an unidentified "affiliated party" without obtaining plaintiffs' consent or an independent appraisal of these assets' value. Berenson allegedly mailed statements to Lindner which made it appear that revenues received from the sale of one of the oil wells was income from operation of the oil wells owned by the 1983–G partnership. The

amended complaint does not specify when Berenson sent the statements to Lindner or any other plaintiff.

The Texas venture took place after the Ohio ventures. O & G Carriers, Bren and Rothfarb allegedly made their investments in the Texas venture in May of 1986.

It is alleged that these investors relied upon both the partnership's offering memorandum and the Hamby report. Smith allegedly gave those documents to O & G Carriers on June 13, 1986, and the Berson firm allegedly sent them to Bren and Rothfarb on the same date. That date is after O & G Carriers, Bren and Rothfarb had allegedly invested.

Nevertheless, the amended complaint alleges that both the offering memorandum and the Hamby report contained four identical false and misleading statements: that there were six wells in operation at the Texas field; that ARCO had converted seven of the wells at the field from gas lift to beam pump operation, and that six of those wells were producing oil; that the Smith defendants intended to continue this conversion program; and that there would be sufficient income from the wells to convert more wells to beam pump operation. The offering memorandum also allegedly stated that the Smith defendants had been successful on 99 of the 108 wells they had previously drilled, although it also disclaimed any intention to drill additional wells at the Texas field. It is alleged that one of the six wells, well B-5, was not producing oil at the time, but otherwise the amended complaint does not explain how these statements are alleged to be false or misleading.

There are also allegations of improper expenditures related to the Texas oil field. It is alleged that the Smith and Luck defendants spent all the income from the operational wells in an unsuccessful attempt to get well B-5 to operate and spent funds belonging to the 1986-A partnership in an attempt to cause another well, well B-2, to operate, although plaintiffs allege that this expense was somehow unjustified. Plaintiffs allege that Luck benefitted from these purportedly improper expenditures because "Luck Petroleum charged a supervisory drilling rate of $200.00 for each of the wells, in addition to the sums for reworking wells."

It is also alleged that Luck Petroleum sent falsified or padded bills to "the Berenson firm on behalf of the 1986-A partnership or to O & G Carriers" on various dates. O & G Carriers allegedly requested substantiation of the bills, and the Luck defendants allegedly "remitted falsified American Express receipts." The amended complaint, however, does not disclose which bills were sent to the Berenson firm and which were sent to O & G Carriers, nor does it specify the amount or substance of the bills or how the bills were inflated or false. It is also not alleged that anyone—plaintiffs, defendants or the 1986-A partnership—paid these bills, and it is not explained how these bills in any way injured the 1986-A partnership or any of the plaintiffs.

There are allegations regarding "additional acts" by the Berenson and Berson defendants in regard to the 1986-A partnership. It is alleged that Berson and his law firm represented O & G Carriers, as well as the 1986-A partnership and the Smith defendants. In this capacity, Berson and his firm allegedly "permitted the transaction to close" despite the fact that well B-5 was not producing oil, failed to advise Bren and Rothfarb of "the facts," failed to correct the offering memorandum, and failed to disclose all the terms of the deal. It is alleged that Berenson and his accounting firm were the disbursing agent for the 1986-A partnership. Berenson and his firm allegedly approved unspecified false payments to Luck and issued income statements for the 1986-A partnership which falsely inflated the oil field's income.

Finally, there are various allegations of mismanagement of the Texas oil field by the Smith and Luck defendants.

## C. PRIOR PROCEEDINGS

Plaintiffs filed their initial complaint on May 8, 1989. The complaint was 40 pages long and comprised 132 paragraphs. It named as defendants all the present defen-

dants except the Hamby defendants. It also named as a defendant the Amoco Production Company. Amoco is no longer a defendant, and its involvement in this case is not relevant to the present motions.

Many of the defendants filed answers to the initial complaint. The Berenson defendants answered on June 23, 1989, the Berson defendants answered on July 10, 1989, and the Smith defendants answered on July 20, 1989.

Two defense motions were made. On October 31, 1989 the Berson defendants moved for summary judgment on all of plaintiffs' claims and for sanctions. On January 10, 1990 the Luck defendants moved to dismiss the complaint pursuant to, *inter alia,* Rules 9(b) and 12(b)(6).

Following a conference with the parties on March 28, 1990, the court dismissed the complaint. The court granted plaintiffs leave to replead. At the conference, the court advised plaintiffs that the amended complaint should contain specific allegations of what constituted the alleged fraud, clear and concise allegations regarding what each defendant did to commit fraud, and specific allegations of scienter for each defendant.

On May 8, 1990 plaintiffs filed the amended complaint. The amended complaint added the Hamby defendants. It is 75 pages long and contains 201 paragraphs.

## DISCUSSION

Defendants have moved to dismiss the amended complaint on the grounds that, *inter alia,* it violates Rule 9(b) and fails to state a claim under either the federal securities laws or RICO.

▮ Plaintiffs argue initially that those defendants who answered the initial complaint have waived their right to move against the amended complaint under Rule 9(b). This argument is meritless. The amended complaint is a wholly new document which must comply with Rule 9(b) independently.

## A. SECURITIES FRAUD CLAIMS

▮ A complaint alleging securities fraud must comply with Rule 9(b)'s requirement that the circumstances constituting fraud be plead with particularity. Rule 9(b) requires that a fraud complaint set forth (1) precisely what statements were made in what documents or oral representations or what omissions were made; (2) the time and place of each such statement, and the person responsible for making it (or, in the case of omissions, not making it); (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendants obtained as a result of the fraud. *O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 225 (S.D.N.Y.1989). Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud. *DeVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). Additionally, a fraud complaint must allege facts from which an inference of scienter can be drawn. *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1122 (S.D.N.Y.1982).

### 1. *Ohio Transactions*

Plaintiffs do not specify which of the amended complaint's allegations relate to securities fraud, which relate to RICO and which relate to state law theories. It seems clear, however, that there are two securities fraud claims in regard to the Ohio ventures. First, there is a claim that the offering memorandum for each of the four partnerships contained material misrepresentations and omissions and that plaintiffs relied on the offering memoranda. With minor exceptions, the alleged misrepresentations and omissions in all four memoranda are the same. Second, there is a claim that Anneliese Lindner, when she invested in the 1984-J and 1985-K partnerships, relied upon income statements for the 1983-G partnership that were mailed to her husband. It is alleged that these income statements made the 1983-G partnership appear profitable when it was not.

In regard to the claim about the offering memoranda, the court will examine the allegations concerning the 1983–G partnership, which are typical of plaintiffs' Ohio claims. Jack Lindner invested in the 1983–G partnership, and it is alleged that he relied upon the offering memorandum in deciding to purchase an interest in the partnership. The defendants who are alleged to have participated in the fraud in regard to the 1983–G partnership are the Smith, Berson and Berenson defendants. The only loss alleged is Lindner's investment. There are four alleged misrepresentations contained in the offering memorandum. The court will examine each of them in turn.

■ The first alleged misrepresentation is contained in ¶ 34A. The alleged misrepresentation is the following statement: "The investors in a prior Smith partnership received ... a cumulative return on the sums invested of 53.6%." The statement is alleged to be false or misleading because

the return to investors in prior Smith partnerships was artificially inflated by the defendants Smith and Berson's failure to accrue or to pay operating expenses for a period of time before the G partnership offering; by distribution of funds represented to be proceeds of sales of oil and gas which actually constituted proceeds of sales of equipment paid for by the investors, i.e.—by the return of partner's capital, and by the use of proceeds of sales of equipment to defray operating expenses. The Berson defendants failed to disclose the information in the offering memorandum, which Berson knew or should have known. The memorandum indicated falsely that the distributions were from operating distributions, without regard to the crucial difference to an investor between operating and non-operating cash distributions.

There are virtually identical allegations regarding the offering memoranda for the J partnership, the K partnership and the L partnership. ¶¶ 47A, 65A, 83A.

There are several problems with this allegation. First, it is alleged that the offering memorandum represented that investors in a prior Smith partnership received a partic-

ular return on their investments, but it is not specified *which* prior partnership. There is then an allegation that the return to investors in prior Smith *partnerships* were artificially inflated. Because the partnerships at issue are not identified, it is impossible to tell whether the "partnership" in the first sentence is one of the "partnerships" in the second sentence. Moreover, the switch from singular to plural within the same paragraph exacerbates the vagueness of the allegation. It is thus impossible to tell if the paragraph even alleges that the statement in the offering memorandum was false.

Furthermore, the allegations relating to the manner in which the return to investors in prior partnerships was inflated are impermissibly vague. In essence, it is alleged that Smith and Berson failed to accrue or to pay some unspecified operating expenses for some unspecified period of time; distributed funds represented by some unspecified person at some unspecified time to be proceeds of unspecified sales of oil and gas when in fact the distributed funds were proceeds of unspecified sales of unspecified equipment; and at some unspecified time used proceeds of unspecified sales of unspecified equipment to defray unspecified operating expenses. This is not an adequate allegation of fraud.

The paragraph also fails to specify which defendant was responsible for which statement or omission. Plaintiffs' allegation in ¶ 33 that "[t]he memorandum contained material prepared by the Smith, Berson and Berenson defendants" leaves those defendants entirely in the dark about what specifically each of them represented to plaintiffs or failed to disclose in the offering memorandum. This indiscriminate grouping of defendants violates Rule 9(b).

■ The second alleged misrepresentation in the 1983–G offering memorandum is contained in ¶ 34B. The alleged misrepresentation is the following statement: "Between 10 and 16 wells were drilled by each of the prior Smith partnerships, with the exception of one which was recently formed. (The offering memorandum emphasized the large number of wells drilled

by prior Smith partnerships)." It is alleged that this statement was false or misleading because

> the number of wells drilled in prior partnerships was accomplished in part by loans, notwithstanding that the G partnership offering memoranda, among others, represented that if additional funds are needed they will be obtained from revenues of the program. The funds used to drill the wells in prior programs constituted improper loans or commingling of funds between Smith partnerships. The G partnership was exposed by the defendant Smith, Berenson and Berson's misrepresentations and practices to the risk of commingling funds or loans between Smith partnerships, in that the defendants permitted at least $43,000 of G Partnership's funds to be loaned to a prior Smith partnership, the F partnership. The loans violated the terms of, upon information and belief, all of the offering memoranda for the Smith partnerships.

There are similar allegations in regard to the 1984–J, 1985–K and 1985–L partnerships' offering memoranda. ¶¶ 47B, 65B, 83B.

It is entirely unclear from ¶ 34B what the alleged misrepresentation was. It is not alleged that the statement about the number of wells was untrue. The only challenge to that statement appears to be that some of the prior drilling had been funded by loans, but there is no allegation that there was any statement in the offering memorandum relating to whether or not loans had been used. There is an allegation that the loans constituted improper commingling of funds between Smith partnerships, and that misrepresentations and practices by the defendants exposed the 1983–G partnership to the risk of commingling of funds. It is not specified, however, what those misrepresentations and practices were or which defendant made what misrepresentation or engaged in what practices. There is a reference to a representation made in "the G partnership memoranda, among others" that if "additional funds are needed they will be obtained from revenues of the program," but this allegation

does not even specify which documents it is referring to. Moreover, it is not specified whether there was any loss, much less how large a loss, as a result of these alleged improper loans of 1983–G partnership funds. The allegations in ¶ 34B violate Rule 9(b).

■ The final two alleged misrepresentations in the 1983–G offering memorandum are contained in ¶¶ 34C and 34D. These paragraphs can be discussed together. Paragraph 34C alleges that the offering memorandum stated that "in order to purchase a unit in the G partnership, a prospective subscriber was required to deliver a check in the amount of the price of the unit together with the subscription agreement, and a minimum amount of funds were required to be raised for the offering to close." It is alleged that this statement was false or misleading because

> the offering was permitted to close by Berson, Berenson and other defendants notwithstanding that several subscribers, including Smith, failed to deliver their checks or funds by other means until after the closing. The transaction closed with only $875,000 instead of $1,000,000 at the closing. Subsequently Smith informed the investors that his payment and the payment of another subscriber were not made until the following year.

There is a similar allegation in regard to the offering memorandum for the 1985–L partnership. ¶ 83C.

Paragraph 34D alleges that the offering memorandum stated that "Mr. Smith ... will purchase a minimum of one unit, and he will receive a non-recurring management fee equal to 6% of the aggregate amount of the amount contributed to the capital of the partnership." It is alleged that this statement was false or misleading because

> Berson, Berenson and other defendants permitted the transaction to close notwithstanding that Mr. Smith received from investors' funds his 6% fee on the sum of $75,000 capital contribution of another person, which were deferred until the following year. Thus, at closing

the funds amounted to less than $875,-000, in that $60,000 was paid to Mr. Smith notwithstanding that he failed to contribute his share.

There are similar allegations about the offering memoranda in the 1984–J and 1985–L partnerships. ¶¶ 47D, 83D.

Paragraphs 34C and D both violate Rule 9(b). First, Berson, Berenson and unspecified other defendants are lumped together without any attempt to particularize what each of them did or even how they "permitted" the transaction to close. Second, the facts alleged simply do not give rise to an inference of fraudulent intent as required by Rule 9(b), and the conclusory assertion of scienter in ¶ 37 does not cure this defect. At most, ¶¶ 34C and 34D allege that Berson and Berenson did not comply with the terms of the offering memorandum. They do not allege a set of facts implying that any of the defendants did not intend to comply with those terms when the offering memorandum was given to potential investors.

There is an additional misrepresentation alleged to be in the offering memoranda for the 1985–K partnership and the 1985–L partnership. ¶¶ 65C, 83E. In ¶ 65C, it is alleged that the offering memorandum for the 1985–K partnership stated that "[i]f additional funds are needed they will be obtained from revenues of the program." It is alleged that this statement was false or misleading because

> Smith and Berson permitted improper overexpenditures with respect to the K Partnership, from funds other than those contributed to partnership capital or from revenues, in the amount of approximately $121,000. Funds were borrowed from other Smith partnerships and from a bank. This was done to make it appear as if the partnership was successful in respect of the number of wells completed, thereby to facilitate sales of interests in future Smith limited partnerships. An additional and undisclosed purpose [of] overexpenditures was to enable Smith to receive an override consisting of one sixteenth or 6.25% of overexpenditures for the additional oil wells. The Berenson

defendants paid Smith the override irrespective of the cost of or obligation to repay the loans. The costs of repayment of the loans materially reduced the income of the plaintiffs as limited partners and the value of their interests. . . .

There is a similar allegation about the offering memorandum for the 1985–L partnership. ¶ 83E.

Paragraph 65C violates Rule 9(b). First, it is not at all clear what the alleged statement means. What is meant, for instance, by "additional funds"? Second, it is not clear how the statement is false. The fact that there were improper expenditures does not mean that the statement was false, nor do the allegations about a fee paid to Smith. Apparently, the allegation is that the taking out of loans was improper because the offering memorandum stated that "additional funds" would come from revenues. There is no allegation, however, that Smith, Berson or any other defendant intended to take out loans when the offering memorandum was sent to potential investors, so that the statement in the memorandum was false. The facts as alleged do not give rise to an inference of fraudulent intent and thus fail to plead scienter in accord with Rule 9(b)'s requirements.

Additionally, it is not specified what Smith and Berson did to "permit" the transaction to close, and, even if one could figure that out, it is not specified what each of them did individually. Indeed, given this lack of specificity, it is not at all clear that they actually took any actions resulting in improper loans. Paragraph 65C is wholly deficient as an allegation of securities fraud.

The allegations of fraud in regard to the Ohio offering memoranda are vague and conclusory. Indeed, many of them are incomprehensible. These allegations violate Rule 9(b).

■ The second securities law claim in regard to the Ohio ventures is that Anneliese Lindner relied upon misleading income statements for the 1983–G partnership when she made her investments in the 1984–J and 1985–K partnerships. In re-

gard to her investment in the 1984–J partnership, it is alleged that "the Berenson defendants prepared and they and the Smith defendants caused [the 1983–G income] statements to be mailed to Lindner" on September 10, October 11, November 8 and December 10, 1984. ¶ 50. It is further alleged that the income statements

> showed net income from oil and gas sold by the G partnership. In fact, the statements failed to disclose deferrals of expenses. Anneliese Lindner and her husband, Jack Lindner on her behalf, were misled to believe from the statements that expenses were paid from the proceeds of the sale of oil and gas developed by the G partnership, and that the initial investment was profitable.

¶ 51. It is then alleged that Anneliese Lindner relied on the "statements referred to above" and "was thereby induced to invest in the J partnership." ¶ 60. The court interprets this allegation· to mean that Anneliese Lindner relied on the 1983–G income statements when she invested in the 1984–J partnership.

The amended complaint, however, does not specify the date when Anneliese Lindner invested in the 1984–J partnership. Therefore, it is impossible to tell whether the 1983–G income statements were mailed before or after she invested. If they were mailed *after* she invested, she does not have a securities fraud claim in relation to the income statements, because she could not have relied on the statements.

The allegations concerning her reliance on 1983–G income statements when she invested in the 1985–J partnership suffer from the same defect. Paragraph 69 lists dates on which 1983–G income statements were mailed to Jack Lindner, but the amended complaint does not say when Anneliese Lindner invested in the 1985–J partnership. Again, it is not possible to tell whether there is a valid securities fraud claim. Because the allegations concerning the 1983–G income statements do not contain sufficient facts to determine whether there is a securities fraud claim, those allegations violate Rule 9(b).

All of plaintiffs' securities fraud allegations in relation to the Ohio ventures violate Rule 9(b). They are dismissed.

### 2. *Texas Transaction*

The securities fraud claim regarding the Texas transaction centers around the offering memorandum for the 1986–A partnership and the Hamby report, which was allegedly attached to the offering memorandum. With one exception, the offering memorandum and the Hamby report included the same alleged misrepresentations. The claim in regard to the Texas transaction is against all defendants. The plaintiffs who invested in the 1986–A partnership are O & G Carriers, Bren and Rothfarb.

The Texas securities fraud allegations, like the Ohio securities fraud allegations, do not comply with the requirements of Rule 9(b). There is repeated undifferentiated grouping of defendants so that it is impossible to tell what each individual defendant is accused of doing. For instance, ¶ 116 alleges that "[a]s a result of the misrepresentations of *the defendants; their* closing the acquisition and concealment of the true value and condition of the working interests acquired, there was minimal or no value in the [interests acquired by O & G Carriers, Bren and Rothfarb]." Paragraph 117 then alleges that "[t]he wells which are in production at this time operate at a marginal profit or at a loss in light of the extraordinary amount of maintenance which is required, and which *all of the defendants* knew or but for their reckless disregard of the facts should have known."

Moreover, the amended complaint nowhere specifies which defendant or defendants were responsible for which alleged misrepresentations in the offering memorandum for the 1986–A partnership. Paragraph 110 alleges that "[t]he representations in [the offering memorandum and the Hamby report] were known to be false and misleading at the time they were made by Smith, Luck, Hamby, Berson and Berenson." This sort of broad-brush allegation

against numerous defendants is inadequate.

■ The allegations of misrepresentations in the offering memorandum and Hamby report are, with one exception, also insufficient. Paragraph 106 alleges five separate false or misleading statements: (1) that there were a total of six wells in operation in the Texas field; (2) that Arco had successfully converted seven wells from gas lift to beam pump operation, and that six of these were producing oil; (3) that the Smith defendants intended to continue this conversion program; (4) that the Smith defendants had in the past been successful on 99 of the 108 wells they had drilled; and (5) that there would be sufficient income from the wells to convert additional wells to beam pump operation. Except for the first statement regarding the number of wells in operation, however, it is never explained how these statements were false. The conclusory allegation in ¶ 107 that the statements alleged in ¶ 106 were "false and misleading" does not provide an adequate basis for a fraud complaint.

As for the statement about the number of wells in operation, the amended complaint alleges that there were only five wells in operation, not six as stated. It is thus clear how the statement was allegedly false. However, as discussed above, it is not specified who was responsible for making this misrepresentation to plaintiffs. Given this problem, the allegation regarding the number of wells cannot support the securities fraud claim.

There is also an allegation that "[t]he projections and the valuation of the property was misleading and was not in accordance with accepted practice for the valuation of oil reserves." ¶ 109. This vague allegation does not indicate who made the projections, what the projections were or how the projections were false and misleading. Indeed, the allegation does not even identify the documents that contained the projections. It is thus entirely unclear whether this allegation is in any way relevant to a securities fraud claim. The Texas securities fraud allegations violate Rule 9(b).

■ The main problem with the Texas allegations, however, is that they do not state a claim of *securities* fraud. In order to state a claim under § 10(b), a plaintiff must allege fraud "in connection with" the purchase or sale of securities.

It is apparent that an alleged fraud cannot be in connection with the purchase or sale of a security if the transaction occurs prior to the fraud. The alleged fraud must be prior to or contemporaneous with the securities transaction in question.

*Perz–Rubio v. Wyckoff,* 718 F.Supp. 217, 236 (S.D.N.Y.1989).

The amended complaint alleges that O & G Carriers, Bren and Rothfarb invested in the 1986–A partnership in May of 1986. ¶¶ 98, 102. The basis of the securities fraud claim in regard to the Texas transaction is that O & G Carriers, Bren and Rothfarb relied upon the allegedly misleading offering memorandum and Hamby report. ¶¶ 106, 114. According to the amended complaint, however, these documents were "delivered" to O & G Carriers and mailed to Bren and Rothfarb on June 13, 1986. ¶ 104.

Since the alleged fraud therefore took place *after* O & G Carriers, Bren and Rothfarb had invested, the alleged fraud was not "in connection with" the purchase or sale of a security.

Plaintiffs attempt to deal with this problem by presenting an argument in their brief regarding "the preliminary offering memorandum." The relevant section of the brief commences with the statement that the trier of fact "may find that the preliminary offering memorandum ... was received by plaintiffs and relied on by them in connection with their investments" (Brief p. 54). However, the relevant allegations in the complaint (with one exception to be noted hereafter) do not deal with a preliminary memorandum but with the final offering memorandum. It is spoken of as "the offering memorandum." It is clearly identified as having been mailed on June 13, 1986. ¶ 104. This unquestionably

refers to the final document and not to a preliminary offering memorandum.

The only allegation in the complaint about a preliminary offering memorandum is contained in ¶ 112, in which it is stated that Luck knew the content of "the offering memorandum" because he subscribed to a limited partnership interest "and was given a copy of the preliminary document and mailed a copy of the final offering memorandum." However, Luck is a defendant, not a plaintiff. There is no allegation to the effect that any of the plaintiffs were given a copy of a preliminary document.

The portion of plaintiffs' brief dealing with this subject will not be summarized in detail. However, the court views it as being a devious attempt to give an impression that somehow the complaint contains allegations about plaintiffs being given and relying upon a preliminary memorandum; the problem is that the lawyer drafting the brief does not really say this, nor can it be honestly said, since the complaint in fact contains no such allegations.

■■■ Finally there are various allegations of mismanagement of the Texas oil fields. Allegations of mismanagement do not state a claim for securities fraud. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (holding that breach of fiduciary duty does not give rise to securities fraud claim).

Because the court dismisses all the securities law claims against all defendants on the grounds discussed above, the court has not considered defendants' various other arguments in support of dismissal of the securities claims. Accordingly the court does not reach the questions of whether the securities fraud claims are barred by the statute of limitations, whether plaintiffs have adequately pleaded "loss causation," whether O & G Carriers may maintain a securities fraud claim in relation to the 1985–L partnership, whether O & G Carriers' Texas claim should be dismissed against all defendants because O & G Carriers did not purchase a "security" when it acquired a minority working interest interest in the Texas oil field, whether the amended complaint adequately alleges "aider and abettor" or "control person" liability against any of the defendants, or whether there are any allegations which would support a claim against the Smith Energy Pension Plan.

### B. RICO CLAIMS

■■■ Plaintiffs assert causes of action under the three substantive RICO provisions, 18 U.S.C. § 1962(a)-(c), and the RICO conspiracy provision, 18 U.S.C. § 1962(d). Defendants attack the RICO allegations, like the securities fraud allegations, on the grounds that the allegations do not comport with Rule 9(b) and fail to state a claim. All elements of a RICO claim must comply with Rule 9(b). *Plount v. American Home Assurance Co.*, 668 F.Supp. 204, 206 (S.D.N.Y.1987).

#### 1. *Predicate Acts*

Plaintiffs base their RICO claims on the predicate acts of mail fraud, wire fraud and securities fraud. None of these predicate acts is pleaded sufficiently to support a RICO claim.

■■■ As discussed above, plaintiffs' allegations of securities fraud violate Rule 9(b), and the Texas securities fraud allegations fail to state a cognizable claim. These conclusions apply with equal force in the RICO context. Therefore, the securities fraud allegations are not adequate to constitute properly pleaded predicate acts.

■■■ The mail and wire fraud predicate act allegations are also insufficient. The amended complaint nowhere specifies which allegations relate to mail fraud or wire fraud. It alleges that the "mailings *include but are not limited to* those ... referred to above in this complaint." ¶ 149. But this reference is wholly vague and what is actually meant to be included cannot be discovered. The wire fraud claim suffers from the same defect. *See* ¶ 150 ("The wires *include but are not limited to* those which are referred to above in this complaint....."). Therefore, all the alleged predicate acts for the RICO claim are insufficiently pleaded.

## 2. Enterprise Allegations

Section 1962(a) makes it unlawful "for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest ... such income to acquire an interest in or operate an enterprise." 18 U.S.C. § 1962(a). Section 1962(b) makes it unlawful for any person "through a pattern of racketeering activity ... to acquire or maintain ... any interest in or control of" a RICO enterprise. 18 U.S.C. § 1962(b). Section 1962(c) makes it unlawful "to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c).

 One element of a cause of action under any of these three provisions is the existence of a RICO "enterprise." An enterprise is generally a group of persons associated together for a common purpose of engaging in a course of conduct. Evidence of an ongoing organization, the associates of which function as a continuing unit, suffices to prove an enterprise. *Procter & Gamble v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 15 (2d Cir.1989), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990). Plaintiffs make five separate allegations of RICO enterprises. First, it is alleged that the defendants were "associated in fact" and that this association in fact was an enterprise. Second, it is alleged that each Smith partnership was an enterprise. Third, it is alleged that the Smith partnerships collectively were an enterprise. Fourth, it is alleged that the defendants themselves were collectively an enterprise. Fifth, it is alleged that each individual defendant was an enterprise.

There are numerous problems with the enterprise allegations. Paragraph 162 alleges:

All of the defendants conducted or participated in the conduct of one or more of the enterprises through the above-described patterns of racketeering activity, ... in violation of 18 U.S.C. Sec. 1962(c).

It is simply not possible to determine from this allegation which defendant or defendants participated in which enterprise or enterprises. This broad-brush allegation against multiple defendants is precisely the sort of pleading prohibited by Rule 9(b).

 Additionally, the paragraphs which purport to define the enterprises are wholly conclusory. For instance, ¶ 155 states: "During all relevant times all of the Smith partnerships were partnerships and therefore each partnership constituted an enterprise as that term is defined in 18 U.S.C. Sec. 1961(4)." There is no explanation of the purported enterprise's nature, purpose or course of conduct. The same problem exists in regard to ¶¶ 154, 156, 157 and 158. These allegations merely parrot the language of § 1961(4), which defines an enterprise to include "[a]ny individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Plaintiffs must provide more than statutory language if they wish to plead the existence of a RICO enterprise.

 Moreover, plaintiffs have failed to allege, as they must, that the purported enterprises are entities "separate and apart from the pattern of activity" in which they allegedly engage. *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). An enterprise must have "an existence beyond that which is merely to commit each of the acts charged as predicate racketeering offenses." *Zola v. Gordon*, 685 F.Supp. 354, 373 (S.D.N.Y. 1988) (quoting *United States v. Riccobene*, 709 F.2d 214, 223–24 (3d Cir.1983)). The vague and rambling allegations of the amended complaint simply fail to indicate whether there is any distinction between the enterprises and the alleged pattern of racketeering.

 Furthermore, four of the five enterprise allegations run afoul of the well established rule that "for a § 1962(c) claim to be viable, the RICO 'person' engaged in the proscribed conduct ... and the 'enterprise' must be different from one another, i.e., they must be separate entities." *Jacobson v. Cooper*, 882 F.2d 717, 719 (2d Cir.1989). The amended complaint names all the defendants and all the Smith part-

nerships as "persons" subject to RICO liability. ¶ 153. The defendants and the Smith partnerships, however, cannot be both RICO "persons" and the RICO enterprise. Therefore, ¶¶ 157 and 158, which allege that the defendants individually and collectively themselves constituted enterprises, and ¶¶ 155 and 156, which allege that the Smith partnerships individually and collectively constituted enterprises, are wholly inadequate to support the RICO claims.

The only named enterprise which is not also alleged to be a RICO "person" is the "association in fact" of the defendants. ¶ 154. That paragraph, however, suffers from the other defects discussed above. The enterprise allegations in the amended complaint do not comply with Rule 9(b).

### 3. § 1962(a)

■ There are additional problems with plaintiff's allegations concerning § 1962(a). To state a claim under § 1962(a), a plaintiff must make two basic allegations: first, that the defendants used or invested racketeering income to acquire or maintain an interest in the alleged enterprise, and second, that the plaintiff suffered injury as a result of that investment by the defendants. *Bingham v. Zolt,* 683 F.Supp. 965, 971 (S.D.N.Y.1988); *In re Gas Reclamation, Inc. Securities Litigation,* 659 F.Supp. 493 (S.D.N.Y.1987).

The amended complaint does not contain either allegation. There are no factual allegations to support the proposition that defendants invested racketeering income to acquire or maintain interests in any of the five named enterprises. The vast majority of the allegations in the amended complaint relate to investments made by *plaintiffs,* not defendants. Plaintiffs point to vague allegations of excessive accountant's fees paid to Berenson and excessive legal fees paid to the Berson defendants. ¶¶ 29, 30. The Berenson and Berson defendants, however, are not alleged to have violated § 1962(a). ¶ 160. Moreover, there is no allegation that these purportedly excessive fees were invested to acquire or maintain an interest in any of the named enterprises.

Plaintiffs also point to ¶¶ 43, 61, 118–122 and 146 in support of the § 1962(a) claim. While these paragraphs allege various improper sales, expenditures and bills, they do not contain any allegations of the requisite investment of racketeering income for a § 1962(a) claim.

Paragraphs 43 and 61 allege that the Smith defendants sold assets of the 1983–G and 1984–J partnerships to an "affiliated party" without plaintiffs' consent or an independent appraisal. There is no attempt to identify the "affiliated party," however, so that it is impossible to tell whether any of the defendants profited from the purportedly improper sales. Assuming, despite this vagueness, that one of the defendants received income from these sales, there is no allegation that this income was invested to acquire or maintain an interest in one of the named enterprises.

Paragraphs 118–122 allege that the Smith and Luck defendants "expended all of the available income from the [Texas] wells which were operating, in an unsuccessful and uneconomical attempt to cause well B–5 to produce oil.... It is also alleged that the Smith and Luck defendants spent more money than was "economically justif[ied]" to cause well B–2 to operate after it had ceased to function. The only allegation that any of the defendants received any income from these purportedly improper expenditures is in ¶ 121, which alleges that the Luck defendants benefitted from the "uneconomical work ... in that Luck Petroleum charged a supervisory drilling rate of $200.00 a day for each of the wells." Again, however, there is no allegation that this income was used to acquire or maintain an interest in one of the named enterprises.

Paragraph 146 alleges that Smith sent false bills to O & G Carriers, but there is no allegation that Smith received any money as a result of these bills, or, if he did, that the money was invested to acquire or maintain an interest in one of the named enterprises. Hence none of the paragraphs pointed to by plaintiffs properly pleads a § 1962(a) claim.

■ Additionally, the amended complaint does not allege the requisite injury for a § 1962(a) claim. Plaintiffs' claim is not that they were injured by defendants' investment in or acquisition of an enterprise. Instead, the claim is that the alleged predicate acts induced plaintiffs to invest in the Smith partnerships. "As the [amended] complaint does not ... allege any damages other than the loss of their investments, and since it is clear that these injuries arise out of the commission of the [alleged] predicate acts, and not from any investment by the defendants of the racketeering proceeds," plaintiffs have not alleged a § 1962(a) claim. *Friedman v. Arizona World Nurseries Ltd.*, 730 F.Supp. 521, 549 (S.D.N.Y.1990).

### 4. *§ 1962(b)*

Plaintiffs' § 1962(b) claim suffers from the same defects as the § 1962(a) claim. To state a § 1962(b) claim, a plaintiff must make two basic allegations: first, that the defendants acquired or maintained an interest in the alleged enterprise through a pattern of racketeering activity, and second, that the plaintiff suffered injury as a result of the acquisition of the enterprise. *Bingham, supra.*

The amended complaint is entirely devoid of factual allegations that would support a claim that any of the defendants acquired or maintained an interest in any of the named enterprises through racketeering activity. There is also no claim that plaintiffs were injured as a result of defendants' acquisition of an enterprise. Plaintiffs' claim that the alleged predicate acts induced them to invest does not afford a basis for § 1962(b) liability.

### 5. *§ 1962(c)*

Because, as discussed above, the enterprise allegations are wholly inadequate, it is simply impossible to tell whether plaintiffs might conceivably have a viable § 1962(c) claim.

### 6. *§ 1962(d)*

Section 1962(d) makes it unlawful to conspire to violate § 1962(a), (b) or (c). "Be-cause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990).

■ The only allegation in the amended complaint setting forth a conspiracy claim is ¶ 163: "All of the defendants conspired with each other and with one or more of the Smith partnerships to violate 18 U.S.C. Sec. 1962(a), (b) and (c)...." It is difficult to imagine a vaguer or more conclusory conspiracy allegation. There is nothing in the amended complaint that even approaches the threshold pleading requirements for a § 1962(d) claim.

Therefore, plaintiffs have not sufficiently alleged a violation of any of RICO's provisions. The RICO count of the complaint is dismissed.

## C. STATE LAW CLAIMS

Because the court dismisses the federal claims, the court declines to exercise jurisdiction over the pendent state law claims. Therefore, all state law claims are dismissed.

## D. LEAVE TO REPLEAD

■ The court dismisses plaintiffs' federal claims under Rule 9(b) and dismisses the Texas securities fraud claim under Rule 12(b)(6). Plaintiffs have requested leave to replead.

In *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir.1986), the Court of Appeals stated:

Complaints dismissed under Rule 9(b) are "almost always" dismissed with leave to amend. In cases where such leave has not been granted, plaintiffs have usually already had one opportunity to plead fraud with greater specificity, or the defective allegations were made after full discovery in a related case.

Here, the court dismissed plaintiffs initial complaint for failure to plead fraud adequately. The court granted plaintiffs an opportunity to replead and instructed them to provide clear and specific allega-

tions of fraud. It is also worth noting that there has been substantial discovery in this case. Indeed, the amended complaint refers explicitly to material submitted by some of the defendants on the prior summary judgment motions. ¶¶ 110, 111. Despite the court's admonition and the discovery available to plaintiffs, however, the amended complaint is rife with vague and conclusory allegations.

Under these circumstances, there is no basis for allowing further amendment. The amended complaint is dismissed without leave to replead.

### E. SANCTIONS

■ Defendants have requested sanctions against plaintiffs for filing inadequate pleadings. Plaintiffs have requested sanctions against defendants for making the present motion to dismiss.

The court has considered the requests for sanctions and has concluded that sanctions would be inappropriate. Therefore, the applications for sanctions are denied.

### CONCLUSION

The action is dismissed without leave to replead. Both motions for sanctions are denied.

SO ORDERED.