**Dr. Stanley BERNSTEIN and The Lincoln Service Group, Inc., Plaintiffs,**

v.

**Nasrallah MISK, Dr. Christian Rizk, and Metropolitan Diagnostic Laboratories, Inc., Defendants.**

**96 CV 2762.**

United States District Court, E.D. New York.

Jan. 2, 1997.

232

Michael Levine, Law Firm of Michael Levine, P.C., New York City, for plaintiffs.

Michael C. Silberberg, Morvillo, Abramowitz, Grand, Iason & Silberberg, New York City, for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

### SUMMARY

Plaintiffs Dr. Stanley Bernstein ("Bernstein") and The Lincoln Service Group, Inc. ("Lincoln"), a corporation whose sole shareholder is Bernstein, bring this action against Nasrallah Misk ("Misk"), Dr. Christian Rizk ("Rizk") and Metropolitan Diagnostic Laboratories, Inc. ("MDL") for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b–5, promulgated thereunder, 17 C.F.R. § 240.10b–5. Plaintiffs also allege various state law claims. The defendants move to dismiss the federal claims pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) and to dismiss the state claims for lack of jurisdiction. For the reasons set forth below, the motion should be granted.

### STATEMENT OF FACTS

The essence of the complaint is that Misk, Rizk, MDL, and others have used various individuals and entities as nominees or "fronts" in order to fraudulently procure financing from lending institutions and investors. Compl. ¶ 10. In allegations spread over fourteen pages and seventy-one paragraphs, the plaintiffs repeatedly describe transactions alleged to be fraudulent and which follow essentially this pattern or a variant thereof: Misk, or one of several nominees, borrow money from a lending institution with which to purchase real property. The loan is secured by a first mortgage. The loan thereafter intentionally remains unpaid thus inducing the lender to foreclose the mortgage. Misk or one of several nominees then acquires the property at a substantially reduced price. Before doing so, however, the mortgagor divests himself of all his assets so that a deficiency judgment obtained incident to the foreclosure is uncollectible.

One of the properties thus acquired by a Misk nominee, Golden Towers Realty Co. ("Golden Towers"), was a hospital building located at 46–02 31st Avenue in Long Island City, New York. In connection with that acquisition, Misk obtained a $1.5 million loan from Capital National Bank ("CNB") which he used to purchase medical equipment, construct residential housing on neighboring properties and to renovate the first floor of the building to accommodate an ambulatory surgical center to be known as the Queens Surgical Community Center ("QSCC"). Compl. ¶¶ 92–93. Misk also obtained an Operating Certificate pursuant to the New York Public Health Law to operate a testing laboratory (the "Lab") in the building. The Lab was nominally owned by defendant MDL and operated by Rizk. The complaint alleges, however, that Misk was the *de facto* owner.

The acquisition of the QSCC was made possible by a loan from Astoria Federal Savings Bank ("Astoria Federal") which was secured by a first mortgage on the property. Notwithstanding the complaint's allegation that the property was acquired and mortgaged by Golden Towers, ¶ 91, it then alleges that Misk defaulted on the loan and that Astoria Federal acquired the property at the foreclosure sale. Compl. ¶¶ 94, 96. The complaint also alleges that the Federal Deposit Insurance Corporation ("FDIC") became the owner of the medical equipment and assets of the QSCC. Compl. ¶ 96. Nowhere has there been a mention of a chattel mortgage but the court assumes that such a security instrument was given to CNB when it loaned money to Misk for the purchase of medical equipment and that the FDIC, as successor to CNB, became an assignee of that security instrument and through it (by foreclosure it is assumed) became the owner

of the chattels. Compl. ¶ 116. Those chattels were subsequently purchased by Lincoln and a Dr. Zupnick. *Id.*

The complaint also alleges that between 1987 and 1989, Misk, acting individually and through nominees, illegally obtained loans totaling $10 million from CNB. CNB was founded by Carlos Cordova and Misk was a member of its advisory board. The loans remained unpaid and resulted in the intervention of the FDIC and its takeover of the CNB in July, 1990. The Securities and Exchange Commission ("SEC"), in 1991, filed an action against Misk, Cordova and others alleging violations of the federal securities laws. A consent judgment was subsequently entered against Misk permanently enjoining him from aiding and abetting violations of the federal securities laws. Compl. ¶¶ 83–87. The relevance of these allegations to the events about which plaintiffs complain is difficult to fathom.

It is significant to note that all of the foregoing, spread over twenty-five pages and eighty-nine paragraphs, bears no relationship to the plaintiffs, nor implicates them in any way, but is ostensibly pleaded as "background" for what follows.

The plaintiffs' entry into this story allegedly begins in August 1991, when Misk informed Bernstein and one Dr. Medhat Sami that he (Misk) could assist them in purchasing the QSCC property from Astoria Federal at an attractive price because of his favorable relationship with Astoria Federal. Misk also advised them that he would transfer the Operating Certificate to them were they able to purchase the property. Misk did not disclose to them his prior role in numerous real estate transactions to which reference has previously been made, nor did he disclose the consent judgment obtained against him by the SEC.

The acquisition of the building was discussed with Misk over the next several months in person and by phone. There came a time when Misk informed Bernstein and Sami that their combined resources were insufficient to purchase the building. Misk then introduced Rizk to them as a source of additional financing, not revealing, however, the complaint alleges, that he was in reality Misk's nominee. An oral agreement was eventually reached by the terms of which Bernstein, Sami and Rizk would own the building and the QSCC within it through a corporation to be formed for that purpose. It was contemplated that Bernstein would bring his abortion practice to the QSCC and the income to be thus derived would enable the QSCC to succeed and eventually make it attractive for purchase by a major corporation and produce a large profit for the principals.

Astoria Federal refused to make the loan essential to the purchase of the QSCC when it learned of Misk's involvement. Sami then recruited his brother-in-law Roy Peterson ("Peterson") to head the purchasing group and Roy Pet Realty Corp. ("Roy Pet") was formed to become the borrower.

A contract was eventually entered into between Astoria Federal as vendor and Roy Pet as vendee by the terms of which the property would be sold for $2.15 million. Sami, Peterson, Rizk and Bernstein (through Lincoln) made a down payment of $250,000 to which each contributed an equal amount. The balance of the purchase price was to be financed by Johnson and Johnson Finance Corporation ("J & J") provided Bernstein, Sami and Peterson personally guaranteed the loan. Sami and Peterson refused and withdrew from the project. Compl. ¶¶ 119, 120. They were replaced by Arias Schwarz as a shareholder in Roy Pet. Personal guarantees were then executed by Bernstein and the Estate of Gustav Schwarz for the benefit of Arias Schwarz. The acquisition of the building closed on August 31, 1993.

The foregoing summary has been distilled from a complaint which can be described, only charitably, as challenging. Beyond that, attempts to summarize the complaint coherently fail. For example, ¶ 121 describes the percentage interests of Bernstein, Rizk and Schwarz in Roy Pet, purportedly fixed by an oral agreement among them, and the contemplated source of income to be derived from rents paid by the Lab, the QSCC, Bernstein's medical practice, etc. Misk is not mentioned as having any pecuniary interest whatsoever in Roy Pet. Incomprehensibly, however, the complaint alleges that Misk (who had no

ownership interest in it) caused title to the building to be transferred to an entity known as BSR Realty L.P. Compl. ¶ 123. The following paragraph, 124, alleges that Misk manipulated insurance payments. "In fact, no insurance payments were ever billed by Misk during the entirety of 1994." The insurance payments refer to reimbursements by insurance companies for medical services rendered by Bernstein. Misk's connection to this is mystifying.

Even more puzzling is the allegation in ¶ 125 that Misk refused to permit "Bernstein's abortion patients access to the QSCC facilities," bearing in mind, that Misk is not shown to have any ownership interest in the property. Continuing with this remarkable saga is the next allegation in ¶ 126 that *Misk* failed to pay the monthly mortgage installments due J & J for almost a full year and an action to foreclose the mortgage was commenced. In ¶ 128, it is alleged that *Misk* failed and refused to pay real estate taxes on the property.

The failure by Misk, who as near as can be discovered owns no interest in this property, to pay mortgage installments and property taxes is, it is alleged, in furtherance of a scheme by Misk to defraud J & J and extinguish the interest of the plaintiffs in this property. It is also interesting to note that at oral argument it was revealed that Bernstein never consulted with or was represented by counsel during his entanglement in this legal maze.

The complaint in this action was filed on June 4, 1996. In addition to alleging violations of RICO and the federal securities laws against Misk, Rizk and MDL, it charges them with breach of contract, breach of fiduciary duty, and common law fraud and seeks damages plus declaratory and injunctive relief.

## DISCUSSION

### I. *Motion to Dismiss Standards*

On a motion to dismiss, the factual allegations of the complaint must be accepted as true, and the complaint must be liberally construed and its allegations considered in the light most favorable to plaintiffs. *Morin v. Trupin*, 711 F.Supp. 97, 103 (S.D.N.Y. 1989) (citing *Dwyer v. Regan*, 777 F.2d 825, 828–29 (2d Cir.1985) and *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). "A motion to dismiss will be granted only if it appears to be certain that the plaintiff is entitled to no relief under any set of facts which could be proved in support of the claim made." *Id.* (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)).

### A. *The RICO Claims*

To state a claim for damages under § 1962(a)–(c), a plaintiff has two pleading burdens. First, he must assert that the defendant has violated 18 U.S.C. § 1962, the substantive RICO statute. This requires the plaintiff to allege (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an enterprise (7) the activities of which affect interstate or foreign commerce. *Moss v. Morgan Stanley, Inc.* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Second, he must allege that he was injured in his business or property by reason of a violation of § 1962. *Id.* Because both the complaint and the defendants' motion to dismiss are primarily focused on § 1962(c), the court will examine the sufficiency of the pleadings under that subsection first.

#### 1. *Section 1962(c)*

Section 1962(c) makes it unlawful to participate in the conduct of an "enterprise" through a "pattern of racketeering activity" in interstate or foreign commerce.[1] The defendants argue that the § 1962(c) claims

---

1. Section 1962(c) provides in full:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. 18 U.S.C.A. § 1962(c) (West 1984).

should be dismissed pursuant to Fed. R.Civ.P. 9(b) and 12(b)(6) on the grounds that the complaint (1) fails to properly plead the existence of an "enterprise;" (2) fails to adequately allege the commission of two predicate acts by the defendants; (3) fails to sufficiently plead a pattern of racketeering activity; and (4) fails to plead that a. RICO violation caused injury to plaintiffs' business or property.

### a. *Enterprise*

■■■ "Enterprise" is defined in the RICO statute to include "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961(4). The term "person" includes "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C.A. § 1961(3). In *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981), the Supreme Court explained that an enterprise is a "group of persons associated together for a common purpose or engaging in a common course of conduct ... [It is] proved by evidence of an ongoing organization, formal or informal, and by any evidence that the various associates function as a continuing unit." Courts in the Second Circuit should look to the "hierarchy, organization, and activities" of an association-in-fact to determine whether "its members functioned as a unit." *United States v. Coonan,* 938 F.2d 1553, 1560–61 (2d Cir.1991), *cert. denied,* 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992). For an association of individuals to constitute an enterprise, the individuals must "share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *Moll v. U.S. Life Title Ins. Co.,* 654 F.Supp. 1012, 1031 (S.D.N.Y.1987). For purposes of § 1962(c), the Second Circuit requires that the alleged racketeering enterprise be distinct from the persons who participate in it. *See Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d Cir.1994).

The complaint alleges the "enterprise" to consist of "Misk, Rizk, various other individu-

als and their various related companies." The purpose of the enterprise is alleged to be engaging in "massive and ongoing illegal activities affecting interstate and international commerce." Compl. ¶ 9. It should be noted that although MDL is named as a defendant, it is not included as a member of the enterprise as above defined. In ¶ 130 of the complaint, however, it is alleged that "[t]he *defendants* and each of them are members, or associates of members, of the QSCC, the Lab, and the various nominee entities described above, an association-in-fact." (Emphasis added). Neither allegation describes an "organization whose various associates function as a continuing unit" as is required by *Turkette* or clearly differentiate between the "person" and the "enterprise" as being separate and distinct entities as required. *See Riverwoods,* 30 F.3d at 344; *Bennett v. United States Trust Co.,* 770 F.2d 308, 315 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). The indispensability of distinguishing between the person and the enterprise has been tersely explained by Judge Posner as follows: "you cannot associate with yourself, any more than you can conspire with yourself, just by giving yourself a *nom de guerre.*" *McCullough v. Suter,* 757 F.2d 142 (7th Cir.1985). The indifferent attempts to plead the existence of an enterprise fall short of their goal in that they frustrate assiduous efforts to identify its membership, its structure (formal or informal), or its functional unity.

### b. *Pattern of Racketeering Activity*

■■ In defining a "pattern of racketeering activity," the RICO statute requires at least two predicate acts that occurred within ten years of each other. 18 U.S.C. § 1961(5). However, while the showing of two acts is necessary, without more it is not sufficient to establish a pattern. In *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 240, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989), the Supreme Court explained that, in order to show a pattern, a plaintiff must show both relationship and continuity among the predicate acts. The RICO violations urged by plaintiffs are claimed to involve predicate acts of mail and wire fraud, finan-

cial institution fraud, money laundering and Travel Act violations.[2]

### i. *Relationship*

■■■ Predicate acts are "related" when they "have the same or similar purposes, results, participants, victims, methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc.*, 492 U.S. at 240, 109 S.Ct. at 2901. According to the complaint, the purpose of the acts of bank fraud was to defraud lending institutions and illegally acquire funds and the result was substantial losses to the banks that were victimized. *See e.g.* Compl. ¶¶ 11, 16, 20, 24, 29, 35.

The participants in those predicate acts included Misk, Golden Towers, Roosevelt Equities, Titan Townhouses, and KIT Realty, and the method of commission involved the participants obtaining loans, defaulting on loan obligations in order to reacquire property at a cheaper price, defaulting after devaluing property or fraudulently obtaining loans through nominee borrowers. As has been indicated, not one of those allegations implicated the plaintiffs in any discernible way.

In contrast, the purpose of the mail and wire fraud acts committed in the QSCC venture was to defraud investors in a real estate transaction. The participants in those predicate acts were Misk, Rizk, the QSCC and the

---

**2.** Plaintiffs' money laundering charges pursuant to 18 U.S.C. §§ 1956 and 1957 are so vague it is difficult to find factual support for them in the complaint or attribute them to the defendants. While plaintiffs need not plead money laundering with great particularity, they must nonetheless plead all essential elements of the offenses. *See Ray v. General Motors Acceptance Corp.*, No. 92 Civ. 5043 (DGT), 1995 WL 151852, at *5 (E.D.N.Y. March 28, 1995). To allege a violation of 18 U.S.C. § 1956, it must be pleaded that (1) the individual conducted a financial transaction in interstate commerce, (2) with knowledge that the property involved in the transaction represented some form of unlawful activity, (3) with the transaction in fact involving the proceeds of specified unlawful activity, (4) with the purpose, in whole or in part, of concealing or disguising "the nature, the location, the source, the ownership or the control" of the "illegally acquired proceeds." *United States v. Campbell*, 777 F.Supp. 1259, 1263 (W.D.N.C.1991), *aff'd in part and rev'd in part*, 977 F.2d 854 (4th Cir.1992), *cert. denied*, 507 U.S. 938, 113 S.Ct. 1331, 122 L.Ed.2d 716 (1993). The only allegations in the complaint which pertain to money laundering are the conclusory assertions that Rizk and MDL laundered funds for the enterprise, Compl. ¶¶ 7, 8, and that Rizk omitted to tell Dr. Bernstein that he had done so. Compl. ¶ 106. These conclusory statements are unsupported by any facts in the complaint and fail to satisfy the essential elements of the statute. As such, they cannot support an inference that any defendant violated § 1956. To violate 18 U.S.C. § 1957, a defendant must have (1) knowingly engaged or attempted to engage in a monetary transaction involving criminally derived property, (2) with such property being valued at more than $10,000, and (3) with such money actually being derived from specific criminal activity. *Campbell*, 777 F.Supp. at 1267–68. The complaint does not describe which defendants or transactions violated this statute or what funds were derived from criminal activity. Therefore, the § 1957 predicate cannot stand.

The purported violations of The Travel Act, 18 U.S.C. § 1952, are similarly vague. The Travel Act is violated when (1) a person uses a facility of interstate or foreign commerce, such as the telephone, (2) with intent to facilitate the promotion, management, establishment, or carrying on, of any unlawful activity and (3) thereafter performs an additional act in furtherance of the specified unlawful activity. *United States v. Jenkins*, 943 F.2d 167 (2d Cir.), *cert. denied*, 502 U.S. 1014, 112 S.Ct. 659, 116 L.Ed.2d 751 (1991). Here, plaintiffs have not given adequate notice to defendants of what facility of interstate commerce was used by Misk or Rizk nor identified the unlawful activity sought to be carried on or promoted thereby. In addition, to the extent that the Travel Act allegation refers to Misk's telephone calls to Dr. Bernstein, the charge is repetitive of the wire fraud claim and should not be counted again to create a pattern. *See, Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F.Supp. 1053, 1078 (D.Md.1991) (single payment cannot constitute both a bribe and a Travel Act violation to form a pattern).

The complaint also appears to offer securities fraud as a predicate racketeering act. However, the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 737 (1995), amended 18 U.S.C. § 1964 to provide that "[N]o person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." In *In Re Prudential Securities, Inc. Limited Partnerships Litigation*, Judge Pollack explained that "Congress intended this language to not only remove securities fraud as a predicate act under Civil RICO, but also to prevent the pleading of 'other specified offenses such as mail and wire fraud, ... if such offenses are based on conduct that would have been actionable as securities fraud.' H.R.Conf.Rep. No. 369 at 47." 930 F.Supp. 68, 77 (S.D.N.Y.1996). As discussed in part II below, plaintiff's securities fraud claims are legally insufficient in any event.

Lab, and the intended victims were Bernstein, Sami and Peterson. The desired result was to induce participation in a real estate transaction and later extinguish the interests of the investors. Compl. ¶ 107. Finally, the method of commission involved using unwitting victims, rather than knowing confederates, as "fronts" to reacquire the QSCC after foreclosure.

Because the bank frauds bear almost no relation to the predicate acts which allegedly injured the plaintiffs, they cannot be properly considered as part of the "pattern" of racketeering activity. *Ray Larsen Associates, Inc. v. Nikko America Inc., et al.* No. 89 Civ. 2809 (BSJ), 1996 WL 442799, at *6 (S.D.N.Y. August 6, 1996). *See also, Vild v. Visconsi*, 956 F.2d 560, 567 (6th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 99, 121 L.Ed.2d 59 (1992) (noting that plaintiff "cannot complain about harm to [other entities]"); *Committee to Defend the United States Constitution v. Moon*, 776 F.Supp. 568, 572 (D.D.C.1991) (stating that court would "only consider those acts which have resulted in business or property harm to the [plaintiff]," and holding that plaintiff's claim of harm from those acts on others was "simply too remotely related" to support a RICO claim). Accordingly, this Court should limit its review of the predicate acts to those allegations of mail fraud and wire fraud which are alleged in connection with the QSCC venture.

### ii. *Continuity*

A plaintiff may satisfy the continuity requirement in one of two ways. He must allege either an "open-ended" pattern of racketeering activity (i.e. past criminal conduct combined with a threat of future criminal conduct) or a "closed-ended" pattern of racketeering activity (i.e. past criminal conduct extending over a substantial period of time). *GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 466 (2d Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 2547, 135 L.Ed.2d 1067 (1996).

The Second Circuit has noted that inherently unlawful acts such as murder or obstruction of justice committed by an enterprise whose business is racketeering activity gives rise to the requisite threat of continuity even where the period spanned by the racketeering acts is short. *United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir.1995). However, "in cases concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful, such as frauds in the sale of property, the courts generally have found no threat of continuing criminal activity arising from conduct that extended over even longer periods." *Id.* The alleged predicates in this case are not inherently unlawful.

Plaintiffs' conclusory assertion that the very nature of defendants' predicate acts "[project] into the future with a threat of repetition" is unsupported by the facts alleged in the complaint. Other than plaintiffs' bare allegation, there is no reason to conclude that the defendants will continue to use investors as unwitting "fronts" to reaquire property. To the contrary, the complaint reveals that most of the properties acquired by defendants were acquired by Misk's own partners or companies. In addition, "to infer a threat of repeated fraud from a single alleged scheme would in effect render the pattern requirement meaningless." *Continental Realty Corp. v. J.C. Penney Co., Inc.*, 729 F.Supp. 1452, 1455 (S.D.N.Y.1990). The alleged acts of mail and wire fraud were committed in connection with an isolated real estate venture, the QSCC project, which has been, or will be terminated, with no indication of repetition. As the Circuit Court suggested in *Aulicino*, 44 F.3d at 1113, the threat of continuity is not present in a situation where "the defendant had a piece of property the sale of which, even if by fraudulent means, provided a natural end to his project." That observation is peculiarly apposite here and is fatal to the "open-ended continuity" inquiry.

Whether closed-ended continuity exists is determined by weighing a variety of non-dispositive factors including the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the number of victims and the presence of separate schemes. *GICC*, 67 F.3d at 467 (collecting cases).

A charitable reading of the complaint might find that the predicate acts alleged took place over a span of approximately four and half years, from sometime after August 1991, when Misk had telephone conversations concerning the QSCC project with Bernstein, until February 1996, when J & J began foreclosure proceedings. However, even though the scheme "may have required a number of steps over a determinate period of time, nevertheless because of its terminable nature and single goal it does not meet the requirement of continuity." *Mead v. Schaub,* 757 F.Supp. 319, 323 (S.D.N.Y.1991).

Courts in the Second Circuit have generally held that where the conduct at issue involves a limited number of perpetrators and victims and a limited goal, the conduct is lacking in closed-ended continuity. *See e.g. Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 998–99 (E.D.N.Y.1995) (holding that a single real estate transaction involving one alleged victim, a limited goal and criminal conduct which lasted approximately fifteen months is not sufficient "continuity"); *Airlines Reporting Corp. v. Aero Voyagers, Inc.,* 721 F.Supp. 579, 583–84 (S.D.N.Y.1989) (holding that a complaint alleging a closed-ended, single scheme involving three perpetrators, one victim and an uncomplicated transaction over a thirteen month period failed to adequately plead continuity); *Continental Realty,* 729 F.Supp. at 1454 (holding that a claim alleging fraud in a real estate deal transaction involving one victim, one group of perpetrators, and a single goal occurring over more than a year is not sufficient for closed-ended continuity). The criminal activity alleged in this case involved only one major perpetrator who focused his activity on one group of purchasers in a single, non-complex scheme to obtain financing for a purchase of property and then default on the loan. This does not establish "closed-ended continuity."

Accordingly, plaintiffs have also failed to sufficiently allege a pattern of racketeering activity.

#### c. *Sufficiency of Relevant Predicate Acts*

While the court has concluded that plaintiffs have failed to satisfy RICO's "pattern" requirement, it also bears mentioning that they have failed to sufficiently allege the commission of least two acts of racketeering activity within a ten year period by each defendant as required.[3] § 1961(5); *McLaughlin v. Anderson,* 962 F.2d 187, 192 (2d Cir.1992).

##### (i) Mail and Wire Fraud

A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) the defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme. *S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir.1996).

The scheme to defraud alleged by plaintiffs is the plan to use the Roy Pet purchase group as an unwitting "front" to obtain financing to reacquire the QSCC property and later default on the obligation and extinguish the group members' ownership interests in the property. The defendants correctly assert that the fact that Misk and Rizk intended to default on an obligation cannot transform what otherwise looks like a breach of contract claim into a fraud claim. *See, Drexel Burnham Lambert, Inc. v. Saxony Heights Realty Associates,* 777 F.Supp. 228, 235 (S.D.N.Y.1991) ("an attempt to convert a contract claim into a tort claim by the additional naked assertion that the breaching party never intended to perform is doomed to fail."). However, even if the Court were to find that the plaintiffs' allegations do evince a scheme to defraud, the plaintiffs have set forth no facts which show that the

---

**3.** "Racketeering activity" includes a host of crimes including any act which is indictable under the following provisions of Title 18 of the U.S.Code: section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1952 (relating to racketeering) section 1956 (relating to the laundering of monetary instru-ments), and section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity). 18 U.S.C.A. § 1961(1) (West 1996). The discussion of predicate racketeering acts herein focuses on the acts attributed to Misk and Rizk because the complaint does not attribute any racketeering activity to MDL.

mails or interstate wires were used in furtherance of, or incident to, the scheme.

The complaint's only references to the mails are in summary paragraphs whose boilerplate language states that, "on more than two occasions [the defendants] illegally used the United States mails in violation of 18 U.S.C. § 1341 [and] 18 U.S.C. § 1952(a)(3) et seq." Compl. ¶¶ 130A(a)(i), 130B(b)(i). This conclusory language is unsupported by facts in the body of the complaint. Paragraphs 97 through 129 of the complaint, which cover the entirety of plaintiffs' involvement with Misk and Rizk, are wholly barren of any reference to use of the mails. Because the complaint does not delineate any of the specifics regarding the defendants' use of the mails, there can be no predicate act of mail fraud. *See McCoy v. Goldberg,* 748 F.Supp. 146, 154 (S.D.N.Y.1990) (the assertion of summary legal conclusions regarding the use of the mails absent factual specifics is insufficient to bring the alleged behavior of defendants within the scope of the mail fraud statute).

The allegations in the complaint cannot provide the basis for a wire fraud predicate either. Invocation of the wire fraud statute requires an interstate telephone call. As noted in *McCoy,* where all parties are New York residents, "all telephone calls are presumed to be intrastate and, absent any indication otherwise, the predicate act of wire fraud is not stated." 748 F.Supp. at 154. Given that Misk, Rizk and Dr. Bernstein are all New York residents and Lincoln and MDL are New York corporations, and no interstate calls are alleged in the complaint, "it is unreasonable to assume that interstate use of the wires occurred." *Id.* Therefore, this jurisdictional prerequisite has not been satisfied.

### ii. *Fed.R.Civ.P. 9(b)*

Plaintiffs' mail and wire fraud claims also fail to comply with Fed.R.Civ.P. 9(b) which provides: "In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." When the predicate acts of a civil RICO claim are grounded in fraud, the concerns associated with pleading fraud with particularity take on even greater importance. *Plount v. American Home Assur. Co.,* 668 F.Supp. 204, 206 (S.D.N.Y.1987). A claim of mail or wire fraud must specify the content, date and place of any alleged misrepresentations and the identity of the persons making them. *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172–73 (2d Cir.1990). *See also Official Publications, Inc. v. Kable News Co.,* 692 F.Supp. 239, 245 (S.D.N.Y.1988) (In alleging mail fraud, plaintiff must set forth "the content of the items mailed and specify how each of the items was false and misleading."), *aff'd in part and rev'd in part,* 884 F.2d 664 (2d Cir.1989); *Qantel Corp. v. Niemuller,* 771 F.Supp. 1361, 1369 (S.D.N.Y. 1991) (to plead wire fraud with particularity, plaintiff must identify number of telephone calls that were made and dates on which they were made).

As noted above, plaintiffs' mail fraud claims are insufficient because there are no facts in the body of the complaint that refer to use of the mails in connection with the fraudulent scheme. The only statement which refers to use of the telephone or wires is ¶ 100, which alleges that, sometime after August of 1991, "Misk, Bernstein and Dr. Sami had many telephone conversations" during which Misk bragged about his wealth, failed to reveal that he had engaged in bank frauds, and omitted to disclose the various legal actions commenced against him. Conspicuous by their absence are allegations of the number of calls made, the time or place of the calls, who placed them, and who received them. Without these particulars, the requirements of Rule 9(b) are not satisfied and plaintiffs' wire fraud predicates cannot stand.

### d. *Causation*

In *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21 (2d Cir.1990), the Second Circuit explained RICO's causation requirement as follows:

> The RICO civil liability provision confers standing on any person injured in his business or property by reason of a violation of section 1962. Thus, in order to have

standing, a RICO plaintiff must show: (1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation.... Because a plaintiff must show injury by the conduct constituting the violation of RICO, the injury must be caused by a pattern of racketeering activity violating section 1962 or by individual RICO predicate acts. Moreover, the RICO pattern or acts must *proximately* cause plaintiff's injury.... For our purposes, the RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence.

*Hecht,* 897 F.2d at 24–25 (internal citations omitted).

Plaintiffs allege that they "stand to lose approximately $1,440,000 as a result of the illegal actions of the alleged RICO enterprise." Compl. ¶ 129. They arrive at this figure based on a $500,000 contribution to the project, the expenditure of $130,000 in legal fees, $50,000 in "miscellaneous expenses," and $760,000 in lost income from lease payments for assets partially owned by plaintiffs and used by the QSCC beginning in September 1993. *Id.*

Because the complaint does not adequately specify even a single use of the mails by any defendant or other person incident to the scheme, it cannot be said that plaintiffs' injuries were a reasonably foreseeable consequence of a mail fraud predicate. To the extent that predicate acts of wire fraud are alleged, the link between the misrepresentations and plaintiffs' injuries is weak. As noted above, the only paragraphs in the complaint that mention telephone conversations are those in which Misk bragged to Bernstein about his accomplishments as a real estate developer and in which he failed to disclose his prior acts of bank fraud and the lawsuits commenced against him. Compl. ¶¶ 100–101. These statements were clearly not the reason that Bernstein's investment turned out to be a losing one. *See Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992). Bernstein's major losses—his contribution to the project and the lost lease payments—appear to have occurred more directly as a result of the QSCC's failure to make the lease payments on equipment and Misk's denial of entry to abortion patients. These actions do not constitute racketeering acts and therefore cannot proximately cause a RICO violation.

 In addition, the fraudulent representations allegedly occurred "sometime after" Misk's initial conversation with Bernstein and Sami in August of 1991. According to plaintiffs, the culmination of the scheme, i.e. Misk's refusal to allow Bernstein's patients access to the QSCC and the foreclosure action commenced by J & J, occurred between March of 1995 and February of 1996. As the Second Circuit has noted, "[w]hen a significant period of time has elapsed between the defendant's actions and the plaintiff's injury, there is a greater likelihood that the loss is attributable to events occurring in the interim." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 772 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995).

"When factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions." *Id.* at 768. The complaint mentions at least eight factors not connected with the alleged acts of mail fraud or wire fraud which intervened to substantially cause plaintiffs' injuries: (1) the QSCC's failure to make equipment lease payments, (2) the Lab's failure to make its rental payments, (3) Misk's transfer of the QSCC's title to BSR, (4) Misk's delayed transfer of the Operating Certificate to plaintiff, (5) Misk's manipulation of insurance payments, (6) Misk's refusal to permit Bernstein's patients to access the abortion facility, (7) Misk's failure to make monthly mortgage installment payments to J & J, and (8) Misk's refusal to pay real estate taxes for the building. Thus, even if plaintiffs had adequately plead a violation of § 1962, their RICO claim would still be fatally flawed for failure to allege injury by reason of such a violation.

The temptation to assess the cupidity of Bernstein as being the predominant cause of his claimed injury is well nigh irresistible.

For example, it is virtually impossible to comprehend why he never had the advice of a competent lawyer at every stage of these transactions involving substantial sums of money; how he suffered Misk's obstruction of his clinic on property in which Misk had no discernible legal interest, and; how he suffered Misk to exercise control over insurance reimbursements for services he (Bernstein) provided to patients. Because this complaint is hopelessly flawed for a variety of other reasons which have been explained, the temptation to make that assessment will be avoided.

### 2. § 1962(a)

The failure to adequately allege an enterprise, predicate acts and a pattern of racketeering activity is fatal to all of plaintiffs' RICO claims. However, it should be noted that their § 1962(a) allegations suffer from additional problems. "To state a claim under § 1962(a), a plaintiff must make two basic allegations: first, that the defendants used or invested racketeering income to acquire or maintain an interest in the alleged enterprise, and second, that the plaintiff suffered an injury as a result of that investment by the defendants." *O & G Carriers, Inc. v. Smith,* 799 F.Supp. 1528, 1542 (S.D.N.Y. 1992). Here, there are no factual allegations to support the proposition that the defendants ever received racketeering income in connection with the QSCC venture, and the loans secured as a result of the alleged bank frauds were apparently used to purchase real property, not to acquire or maintain an interest in the alleged enterprise. Additionally, there are no allegations that plaintiffs' injuries were caused by any investment by the defendants. Thus, plaintiffs' § 1962(a) claims must fail.

### 3. § 1962(b)

To state a claim under § 1962(b), a plaintiff must allege that: (1) the defendants acquired or maintained an interest in the alleged enterprise through a pattern of

racketeering activity, and (2) that the plaintiff suffered injury as a result of the acquisition of the enterprise. *O & G Carriers,* 799 F.Supp. at 1543. No factual allegations to support either element have been made here.

Because plaintiffs have failed to adequately allege an enterprise, a pattern of racketeering activity and the requisite causation, their RICO claims should be dismissed.[4]

### B. *The Securities Fraud Claim*

The other federal claim is count three of the complaint, which alleges a claim for damages under Section 10(b) of the Exchange Act, and Rule 10b–5 promulgated thereunder.

### 1. *Statute of Limitations*

Both parties agree that a one year/three year statute of limitations applies to the § 10(b) claim; that is, plaintiffs' claim is barred if it was brought more than one year from the discovery of the fraud or more than three years from the date of its accrual. *Ceres Partners v. GEL Assocs.,* 918 F.2d 349 (2d Cir.1990). A plaintiff in a securities fraud case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud. *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983). "[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Dodds v. Cigna Securities, Inc.,* 12 F.3d 346, 350 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994). Because the issue of inquiry notice is determined by an objective standard, the court may resolve it as a matter of law on a motion to dismiss. *Id.*

---

**4.** Plaintiffs have not alleged facts implying an agreement involving each of the defendants to commit at least two predicate acts as is required to support their claim under § 1962(d). *Hecht,* 897 F.2d at 25–26. In any case, dismissal of the

substantive RICO claims mandates dismissal of plaintiffs' RICO conspiracy claim as well. *See Purgess v. Sharrock,* 806 F.Supp. 1102, 1110, n. 9 (S.D.N.Y.1992).

As noted earlier, the complaint in this action was filed on June 4, 1996. Plaintiffs argue that the filing was within the limitations period because they did not learn of the fraud until J & J began its foreclosure action in February of 1996. They maintain that, until that time, it was their belief that they had invested in a corporation that acquired and operated a property as "it was supposed to."

A review of the facts in the complaint belies this assertion and discloses numerous events that would surely have served as red flags to plaintiffs prior to February 1996. The complaint alleges that Misk refused to execute a written agreement regarding the operating terms of the Lab until March of 1995 and that he "thereafter" withdrew consent to such agreement. It further alleges that Misk intentionally delayed transfer of the Operating Certificate and failed to bill insurance payments for the entirety of 1994. Most tellingly, the complaint states that, in March of 1995, *"in blatant breach of the agreement among the parties,* [Misk] refused to permit Bernstein's abortion patients access to the QSCC facilities ...". Compl. ¶ 125. (Emphasis added). This occurrence alone, which took place some fourteen months before plaintiffs' complaint was filed, would have put any reasonably intelligent person on inquiry notice of Misk's improper actions. Accordingly, plaintiffs' securities fraud claim is barred by the statute of limitations and should be dismissed.

### 2. *"In Connection With"*

 Even if it had been timely filed, the securities fraud claim would still have to be dismissed for failure to plead a fraud "in connection with the purchase or sale" of securities. Section 10(b) of the Exchange Act makes it "unlawful for any person ... (b) [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5, a general anti-fraud provision promulgated by the SEC, provides:

**Employment of manipulative and deceptive devices.**

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. 240.10b–5. The essential elements of a claim under these sections are "(1) damage to plaintiff; (2) caused by reliance on defendant's misrepresentations or omissions of material facts, or on a scheme by defendant to defraud; (3) made with an intent to deceive, manipulate or defraud (scienter); (4) in connection with the purchase or sale of securities; and (5) furthered by defendant's use of the mails [or] any facility of a national securities exchange." *Manufacturers Hanover Trust Co. v. Smith Barney, Harris Upham & Co.,* 770 F.Supp. 176, 179 (S.D.N.Y. 1991). *See also, Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985).

 The Second Circuit has held that misrepresentations or omissions involved in securities transactions but not pertaining to the securities themselves cannot form the basis of a § 10(b) or Rule 10b–5 claim. *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). The "in connection with" requirement mandates that the alleged fraud concern the "fundamental nature of the [securities]: namely, characteristics and attributes that would induce ... investors to buy or sell

the particular [securities]." *Manufacturers Hanover Trust Co. v. Smith Barney,* 770 F.Supp. at 181. A "de minimis" relationship between the fraudulent scheme and the purchase or sale of securities in insufficient. *Id.*

The securities which serve as the predicate for the securities fraud count are claimed to be the shares of Roy Pet, the company formed for the purpose of purchasing the building housing the QSCC. The misrepresentations alleged are those statements made by Misk and Rizk concerning their respective financial positions, and the omissions alleged are their failure to disclose (1) their intent to default on the QSCC mortgage, (2) their prior dealings with lenders, and (3) the lawsuits commenced against them. Compl. ¶¶ 145–48. The complaint alleges that plaintiffs would not have agreed to "purchase" the shares of Roy Pet if full and truthful disclosure of these facts had been made.

The complaint contains few, if any, facts to support the inference that plaintiffs actually purchased Roy Pet shares. The only mention that any funds were ever paid by plaintiffs is the allegation that they contributed one-third of a $250,000 down payment pursuant to the contract of sale between Astoria Federal and Roy Pet. Compl. ¶ 118. Assuming, however, that shares in Roy Pet were issued and purchased by plaintiffs, the misrepresentations and omissions of which they complain have nothing to do with the fundamental nature of those securities. Plaintiffs have alleged nothing more than that Misk and Rizk made misrepresentations about their own financial positions and omitted certain facts concerning their backgrounds and intentions. While these statements and omissions may in a broad sense be related to the transaction, they do not in any way implicate the characteristics or attributes of the Roy Pet shares and hence were not made "in connection with" the purchase and sale of securities. *See Citibank, N.A. v. K–H Corp.,* 745 F.Supp. 899, 903 (S.D.N.Y. 1990) ("To satisfy the 'in connection with' requirement, plaintiff may not allege fraudulent acts which merely happened to involve [securities] in some way.") Accordingly, plaintiffs have failed to satisfy the "in connec-

tion with" requirement and have failed to state a claim under § 10(b) and Rule 10b–5.

## II. *Pendent Jurisdiction*

The exercise of pendent jurisdiction is a matter committed to the sound discretion of the trial court. *Perez v. Ortiz,* 849 F.2d 793, 798 (2d Cir.1988). It is well-settled that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). This court declines to exercise pendant jurisdiction over plaintiffs' state claims in the absence of a federal claim.

## III. *Leave to Replead*

Rule 15(a) provides that "leave [to amend a pleading] shall be freely given when justice so requires." The Supreme Court has held that only "undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ... [or] futility of the amendment" will serve to prevent an amendment prior to trial." *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

The court concludes that the securities fraud claim is time barred and cannot be resurrected by any amendment. Leave to amend that claim is therefore denied. The RICO claim deficiencies are incurable. The essential round peg of continuity, whether open- or closed-ended, cannot be squeezed into the square hole of these facts and the probability of salvaging mail fraud or wire fraud as predicate acts is remote indeed. Accordingly, leave to amend the RICO claims is also denied.

### CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss is granted.

SO ORDERED.